UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Leonard Bessette,

     Plaintiff,

     v.                                      Civil Action No. 2:14–cv–164

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

     Defendant.

## OPINION AND ORDER
(Docs. 13, 18)

Plaintiff Leonard Bessette brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  Pending before the Court are Bessette's motion to reverse the Commissioner's decision (Doc. 13) and the Commissioner's motion to affirm the same (Doc. 18[1]).

For the reasons stated below, Bessette's motion is DENIED, and the Commissioner's motion is GRANTED.

---

[1]  The Commissioner's motion (Doc. 18) does not comply with Local Rule 10(a)(6), which requires that filings "be double-spaced."  *See* Local Rule 9(6)(A) (requiring that motions and memoranda in Social Security cases "must meet the formatting requirements of [Local] Rule 10(a)").  In the future, the Commissioner is directed to comply with Local Rules 9(6)(A) and 10(a) regarding the formatting of filings, or the noncompliant filing may be returned for refiling in compliance with the Rules.

## Background

Bessette was 45 years old on his alleged disability onset date of December 31,
2006.  He dropped out of high school in the 11th grade and never obtained a GED.
(AR 38, 72, 85.)  He has work experience as a factory worker and a carpenter painter.
(AR 21, 38–40, 85.)  He did not have a stable residence during the alleged disability
period: he was incarcerated for periods of time between January 2006 and November
2008 and in 2012 and 2013, homeless at times, living in an apartment on his own for a
period, and staying at his brother's place and at a friend's place at different times.
(AR 37–38, 48, 56, 72–73, 357, 368, 500–700, 553, 2970–3111.)  He has been married
twice and has two children by his first wife.  (AR 1133.)  In the 1990s, he was convicted
of sexual misconduct with his stepdaughter and domestic violence against his second
wife.  (*Id.*)  Also around that time, he sustained a conviction for DUI.  (*Id.*)  In 2008, he
was incarcerated for drinking while on probation.  (*Id.*)

Bessette suffers from Crohn's disease, hepatitis C, cirrhosis, knee pain, back pain,
and depression.  His Crohn's disease was diagnosed in approximately 1985, and causes
pain in his intestines, stomach, and back.  He underwent ileocolic resection in March
2008 for a bowel obstruction, an ostomy closure in August 2008, and multiple other
abdominal surgeries related to his Crohn's.  Despite these surgeries, Bessette has had
persistent symptoms of pain in his back and abdomen, diarrhea, bowel incontinence,
rectal bleeding, and blood in his stool; and he needs to take frequent and urgent bathroom
breaks and frequently soils himself.  In 1997, Bessette was diagnosed with chronic
hepatitis C with cirrhosis, and the diagnosis was confirmed with pathological testing

conducted in March 2008.  As a result of the hepatitis, he has fatigue and low energy.  He has also been diagnosed with tobacco use disorder, typically smoking at least half a pack of cigarettes per day for more than 30 years, as well as a history of polysubstance abuse involving IV drug use and including chronic opioid dependence since the 1980s.

In April 2009, Bessette protectively filed applications for DIB and SSI.  (AR 268, 275.)  Therein, he alleged that he became unable to work on January 1, 2002, and stopped working on April 6, 2009, due to his Crohn's disease, hepatitis C, and cirrhosis.[2] (AR 316.)  He stated that he has chronic stomach and back pain and weak joints.  (*Id.*)  In an updated disability report, Bessette stated that, since December 15, 2008, he has been "very depressed and fatigued" and "[unable to] hold [his] bowel movements."  (AR 377.) He further stated: "I can't remember things well anymore and I am always fatigued and depressed. . . .  I am always in pain.  It keeps me up most nights and . . . down most days."  (AR 381.)  Bessette's applications were denied initially and upon reconsideration, and he timely requested an administrative hearing.  The first hearing was conducted on June 13, 2011 by Administrative Law Judge (ALJ) Ruth Kleinfeld.  (AR 32–50.) Bessette appeared and testified, and was represented by a paralegal.  (AR 34–35.)  On July 28, 2011, the ALJ issued a decision finding that Bessette was not disabled during the relevant period.  (AR 107–18.)  Bessette requested review by the Appeals Council, and on February 6, 2013, the Appeals Council vacated the ALJ's decision and remanded the claim to the ALJ for further administrative hearings.  (AR 125–28.)

---

[2]  At the November 2013 administrative hearing, Bessette amended his alleged disability onset date to December 31, 2006, his date last insured.  (AR 9, 82.)

On August 5, 2013, the ALJ held a second hearing on Bessette's claim, pursuant to the order of the Appeals Council. (AR 51–64.) Unfortunately, however, the ALJ's office had neglected to arrange for a vocational expert (VE) to attend the hearing, as directed by the Appeals Council. (AR 53, 67.) Therefore, on November 6, 2013, a third administrative hearing was held by ALJ Kleinfeld. (AR 65–96.) Bessette again appeared and testified, and was represented by an attorney. A VE also attended and testified at the hearing. (AR 81–94.) On January 31, 2014, the ALJ issued a decision finding that Bessette was not disabled under the Social Security Act from his alleged disability onset date of December 31, 2006 through the date of the decision. (AR 9–23.) Thereafter, the Appeals Council denied Bessette's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–3.) Having exhausted his administrative remedies, Bessette filed the Complaint in this action on July 29, 2014. (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

4

Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The

claimant is presumptively disabled if his or her impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the

claimant's residual functional capacity (RFC), which means the most the claimant can

still do despite his or her mental and physical limitations based on all the relevant

medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R.

§§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the

claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d

at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show

that there is work in the national economy that the claimant can do," *Poupore v. Astrue*,

566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at

step five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ Kleinfeld first determined that Bessette

had not engaged in substantial gainful activity since December 31, 2006, his alleged

disability onset date.  (AR 11.)  At step two, the ALJ found that Bessette had the

following severe impairments: "Crohn's disease/regional enteritis, chronic polysubstance

abuse, right knee impairment status post successful surgery, asthma, tobacco use

disorder, hepatitis C, and a depressive disorder."  (AR 12.)  At step three, the ALJ found that none of Bessette's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 13–16.)  Next, the ALJ determined that Bessette had the RFC to perform "light work," as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except as follows: "[H]e must avoid bending frequently, and requires access to bathroom facilities during the workday at least every [two] hours.  He is able to tolerate routine interactions with co[]workers, supervisors[,] and the general public."  (AR 16.)  Given this RFC, the ALJ found that Bessette was unable to perform his past relevant work as a carpenter painter.  (AR 21.)  Based on testimony from the VE, however, the ALJ determined that Bessette could perform other jobs existing in significant numbers in the national economy, including the jobs of price marker, ticket seller, laundry sorter, document preparer, taper of printed circuit boards, and surveillance-system monitor.  (AR 21–23.)  The ALJ concluded that Bessette had not been under a disability from his alleged disability onset date of December 31, 2006 through the date of the decision.  (AR 23.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

The parties raise three principal issues in their respective motions: (1) the ALJ's finding that Bessette was noncompliant with his treating providers' treatment recommendations; (2) the ALJ's analysis of the medical opinions; and (3) the ALJ's

7

consideration of Bessette's need to take bathroom breaks throughout the day.  After considering these issues and thoroughly reviewing the lengthy record, the Court finds in favor of the Commissioner.  Although the record demonstrates that Bessette suffered from serious medical problems during the relevant period, substantial evidence supports the ALJ's findings that Bessette failed to follow the treatment recommendations of his treating medical providers without good reason and continuously engaged in drug-seeking behavior during the relevant period.  Therefore, and for the additional reasons discussed below, the Court finds that substantial evidence supports the ALJ's decision, including in particular the following statement: "While th[e] evidence suggests [Bessette] might be suffering from some level of physical and mental health limitation, the totality of the evidence . . . does not reflect a level of limitations commensurate with total disability."  (AR 17.)

## I.      Bessette's Compliance with Treatment Recommendations

The ALJ made several findings regarding Bessette's failure to comply with treatment recommendations and drug-seeking behavior, specifically and accurately citing to the treatment notes of multiple medical providers, as follows:

- "In terms of [Bessette's] Crohn's disease, while he alleges ongoing persistent abdominal and back pain, treatment records show that when he takes his medication, his symptoms are substantially reduced or alleviated."  (AR 17 (citing AR 970 ("pain is finally improved, likely from the prednisone and Pentasa as prescribed by Dr. Vecchio"), 1110 ("he took the steroids for a few weeks, felt better[,] then stopped all his medications[;] . . . [he] is unclear on when he actually restarted the prednisone[,] . . . has been taking Pentasa sporadically")).)

- "Medical records . . . reflect that at times during the period under review, [Bessette] has not taken any medication, or followed the treatment recommendations of his medical care providers." (AR 17 (citing AR 1474 ("very difficult to treat Mr. Bessette because of his other comorbidities and substance abuse issues," "[c]ompliance issues are a major problem for him," "he ran out [of Entocort] a few weeks ago and was only taking it sporadically when he [had it]")).)

- "While [Bessette] alleges extreme levels of persistent pain, his records show evidence suggestive of opiate-seeking behavior, including multiple interactions in emergency departments[] and with physicians where he [was] angry that he [was] not . . . prescribed narcotic medications." (AR 17 (citing AR 918 ("bellow[ing]" and cursing after being told he might not receive narcotic medication), 1173 ("noted to be taking more methadone than he had been prescribed," "it appeared as though [he] was obtaining narcotic medication from both South Burlington Family Practice and from Milton Family Practice, so Milton Family Practice denied him any[]more medications"), 1285 ("reviewed his most recent urine drug screen which is again positive for cocaine, confirms methadone as well as hydromorphone," "dependent on narcotics in the setting of history of substance abuse and what appears to be active use of cocaine," "seemed frustrated with only getting one[-]week supply of medication"), 1288, 1325 ("became very upset [when] this resident would not prescribe tramadol for him and walked out without getting the results of his urine"), 1365 ("multiple interactions in the emergency department where he has been angry that he has not received narcotics and has left without signing paperwork"), 1433 ("angry and frustrated that I will not give him more pain meds"), 1435 ("very angry, got up and left ED without signing papers when told no more narcotics and I can[]not give him methadone"), 1466 ("his only interest today is getting pain medicines," "he tried to get pain medicines from Dr. Esparza who refused to give him the[m]," "here now very adamant about obtaining pain medicines[; ] [a]t times he was quite threatening and rude during the interview"), 1501 ("very focused on methadone and/or tramadol," "focused today primarily on med seeking"), 3160 ("self-reported alcohol abuse, daily drinking, as well as methadone for Crohn's disease," "presents with what he describes as narcotic withdrawal, because he reports that 2 days ago someone stole his prescription for methadone, 72 tablets total"), 3191).)

- "[Bessette] was hospitalized for detoxification from opiates and alcohol, and he has been characterized as a chronic substance abuser." (AR 17 (citing AR 2024 ("has returned to alcohol consumption, and is now consuming at least 1 pint of hard liquor per day[;] [h]e also reports the use of 'the occasional line of cocaine'"), ("I have . . . recommended to [him] that he discontinue all alcoholic beverages and seek support in a recovery group."), 3149, 3151, 3160, 3164, 3202 ("reports drinking all day with a friend")).)

- "[T]he record contains substantial evidence of [Bessette's] failure to comply with the treatment recommendations of his various healthcare providers, including his failures to take medications, and attend medical appointments, both for treatment of his Crohn's disease and hepatitis C, throughout the period under review." (AR 18 (citing AR 991, 1325 ("[h]e has no-showed to most of his appointments over the last year and demonstrated a lack of commitment to working with physicians today and I will not refer him to the pain clinic, PT, or urology until he presents back"), 1475 ("has not been compliant with medications and is not compliant with followup," "states he ran out of his medicines [a] few weeks ago, but even when [he] has his medicines, he states he only takes them sporadically"), 1476 ("[t]reating this patient with methotrexate or 6-MP would be difficult . . . and fraught with danger since his compliance factor is extremely low").)

- "In November 2009, treatment records reflect he was then taking no medication for his Crohn's disease, or for his pain.  In June 2010, Heather Stein, M.D., noted [Bessette] had no-showed for most of his appointments over the last year, and demonstrated a 'lack of commitment to working with physicians.'  Further, his treating gastroenterologist, James Vecchio, M.D., indicated in January 2011 that compliance issues were a major problem for [Bessette], and that he had run out of medication a few weeks prior to the appointment and was only taking it sporadically when he did have the medication.  Dr. Vecchio also stated [Bessette] had 'deliberately ignored' the treatment advice of following up with the liver clinic regarding his hepatitis C.  In addition, Dr. Vecchio indicated [Bessette] was continuing to smoke, which he stated would make [Bessette's] Crohn's symptoms worse and more difficult to treat.  Further, Dr. Vecchio indicated [Bessette] did not have the recommended blood work done and that 'his only interest today [was] getting pain medicines.'"  (AR 18 (citing AR 1325, 1466 ("deliberately ignored . . . request [for follow up with liver clinic]," "compliance factor . . . unclear," "continuing to smoke cigarettes, over a pack a day," "follow [up] with Dr. Lidofsky and/or liver clinic again requested but he again refuses"), 1474–75, 1478).)

The ALJ also noted several medical reports from different treating providers who stated that Bessette's complaints of pain were out of proportion to examination findings and appeared amplified, and who observed inconsistent pain behavior.  (AR 17–18 (citing AR 783, 1101, 1501); *see also* AR 918 (prison health center note stating that, "on several occasions" and "customar[ily]," Bessette exhibited pain behavior when visiting the health center to obtain medication, but then was observed to have "[no] difficulty" "as soon as"

he was "some distance away" from the health center).  The ALJ concluded: "In light of [Bessette's] inconsistent treatment and drug-seeking behavior, I found his allegations of pain, and frequent bathroom use somewhat overstated."  (AR 18.)

The record, as cited in the ALJ's decision and quoted above, amply supports the ALJ's finding that Bessette consistently failed to comply with treatment recommendations.  Bessette's treating providers frequently stated that Bessette was not on any type of treatment for his Crohn's disease, despite their advising him that such treatment was critical to his improvement.  (*See, e.g.*, AR 972, 975, 1063, 1112, 1206, 1313, 1478, 1501, 2552, 2646.)  For example, in January 2011, Bessette's treating gastroenterologist, Dr. James Vecchio stated in a progress note that Bessette had failed to return for follow up since December 2009, and had taken Entocort, which had been prescribed for his inflammatory bowel disease (IBD) and Crohn's disease, only "sporadically" and not at all for the prior few weeks when he ran out and failed to contact the office.  (AR 1474.)  Dr. Vecchio further stated that it was "unclear" whether Bessette had complied in taking other prescribed medications including prednisone and Pentasa. (*Id.*)  Bessette returned to see Dr. Vecchio approximately one month later, but he had not undergone the multiple blood tests requested by Dr. Vecchio, stating that "he did not want to get them do[ne]."  (AR 1466.)  Dr. Vecchio noted that Bessette's "only interest today is getting pain medicines" after another doctor (Dr. Esparza) had refused to prescribe them.  (*Id.*)  Dr. Vecchio continued: "[Bessette] is here now very adamant about obtaining pain medicines.  At times he was quite threatening and rude during the interview."  (*Id.*)  Dr. Vecchio wrote that he explained "in detail" to Bessette that he was

trying to control Bessette's Crohn's disease with medications which would also control his pain, but Bessette was "insistent" on obtaining narcotics or "narcotic-like medications or some type of pain medications" through Dr. Vecchio's office. (*Id.*) Dr. Vecchio would not prescribe pain medicine and referred Bessette back to Dr. Esparza. (*Id.*) The Doctor noted that Bessette refused to return to see the "chronic pain management team" and continued to smoke over a pack of cigarettes each day, despite being repeatedly told that "smoking will make his IBD-Crohn's worse and more difficult to treat." (*Id.*) Dr. Vecchio further noted that he suggested that Bessette follow up with Dr. Lidofsky or another practitioner at the liver clinic, but Bessette "has deliberately ignored this request." (*Id.*)

Bessette's next visit to Dr. Vecchio was not until approximately three months later in May 2011, when Dr. Vecchio recorded that Bessette's "main issue" was "the completion of . . . disability paperwork so that he can apply for funds/services/social programs." (AR 2018.) Dr. Vecchio noted that Bessette was still not compliant with his medication usage and was still smoking cigarettes. (AR 2020.) The Doctor considered switching Bessette to a different medication, but stated that "would be difficult" because "his compliance is low." (*Id.*; *see also* AR 1476 (Dr. Vecchio stating that switching Bessette to different medications "would be difficult to accomplish and fraught with danger since his compliance factor is extremely low").) Bessette does not appear to have returned to visit Dr. Vecchio after that May 2011 visit, and he had stopped taking Entocort by October 2011. (*See* AR 2012–13 (October 2011 treatment note indicating that Bessette was not taking Entocort but that it would be prescribed upon discharge),

2552 (May 2013 treatment note stating that Bessette was "[n]ot currently taking anything

for [C]rohn[']s"), 2643–48 (November and December 2011 treatment notes listing

medications and not including Entocort).)

      The Social Security regulations state: "If you do not follow the prescribed

treatment without a good reason, we will not find you disabled."  20 C.F.R. §§

404.1530(b), 416.930(b).  And the Social Security Administration has determined that a

claimant's statements "may be less credible if . . . the medical reports or records show

that the individual is not following the treatment as prescribed and there are no good

reasons for this failure."  SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996); *see* SSR

82-59, 1982 WL 31384, at *2 (1982) ("continued failure to follow prescribed treatment

without good reason can result in denial or termination of benefits"); *Hussnatter v.

Astrue*, No. CV-09-3261 (SJF), 2010 WL 3394088, at *22 (E.D.N.Y. Aug. 20, 2010) ("in

order to be entitled to [disability] benefits . . . , the claimant is required to follow all

prescribed treatment if such treatment can restore his or her ability to work").  Applying

these principles, in *Dumas v. Schweiker*, the Second Circuit affirmed the denial of

benefits to a claimant who failed to heed his examining physicians' diet

recommendations which would have helped his hypertension and headaches.

712 F.2d 1545, 1553 (2d Cir. 1983); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039

(2d Cir. 1983).  Noting that the claimant's physicians "were frustrated by [the claimant's]

unwillingness to help himself," the Second Circuit stated: "Of course, a remediable

impairment is not disabling."  *Dumas*, 712 F.2d at 1553; *see also Calabrese v. Astrue*,

358 F. App'x 274, 277–78 (2d Cir. 2009) (in assessing claimant's credibility, ALJ

properly considered, among other things, that claimant "took no prescription-strength pain medication despite her contention that she constantly experienced [severe] pain . . . [and] was noncompliant in taking the medication that was prescribed by her doctors"); *Russell v. Barnhart*, 111 F. App'x 26, 27 (1st Cir. 2004) (per curiam) ("A claimant's failure to follow prescribed medical treatment contradicts subjective complaints of disabling conditions and supports an ALJ's decision to deny benefits.").

Bessette argues that the ALJ should have evaluated and made findings regarding whether the prescribed treatment would have restored Bessette's ability to work and whether Bessette's failure to comply with prescribed treatment was done for good reason. But no treating or consulting medical provider opined that there were good reasons for Bessette's failure to comply, and it may reasonably be presumed that Bessette's treating providers would not have recommended the prescribed treatment unless they thought it would improve Bessette's condition. Bessette has presented no evidence—other than his own subjective statements—to show that he had good reasons to refrain from following the recommended treatment of his medical providers. And the record contains many treatment notes wherein these providers express their frustration over Bessette's failure to comply with their recommendations and drug-seeking behavior. (*See, e.g.*, AR 918 ("his bag . . . contained Pepsi–a caffeine[-]filled drink which this writer has advised [him] numerous [times] was not good to drink when you ha[ve] Crohn's (since he has often been observed drinking coffee)," 970 ("It is . . . his responsibility to keep track of the methadone, not ours."), 972 ("[I]t is critical that he is compliant with [GI] advice and therapeutic interventions. If [he] decides not to follow their advice, this is going to cause

14

significant issues and he will probably end up back in jail[.]"), 992 ("[H]e needs to take control of his health[;] [h]e has ignored his GI complaints for a number of years now."), 1095 ("In light of his chronic methadone usage and constant desire to obtain more pain medications, it was really very difficult to evaluate him."), 1293 ("I told him he is making a choice to not take the prednisone and take too much pain medicine and that he has not been compliant with ER visits [and thus] will not be given pain meds . . . [from] the [E]R."), 1475 ("Medically he has been difficult to manage due to his . . . compliance issues."), 1476 ("Treating [him] with methotrexate of 6–MP would be difficult to accomplish and fraught with danger since his compliance factor is extremely low."), 1489 ("told him . . . he had to build trust with one provider and stay with that provider[;] he should not be going to two primary care offices [for narcotics]"), 1493 ("[a]dvised he should not seek his meds on a continuing urge[]nt care basis"), 1497 ("I do not [feel] comfortable [prescribing] meds given his history and manner of taking meds."), 2024 ("It is extremely worrisome that [he] has resorted to alcohol use once more, as [this] will increase the likelihood that he will progress to decompensated liver diseases, and will also represent a road block to liver transplantation.").)

Bessette asserts that "the record is not very clear" on what prescribed treatment recommendations Bessette failed to follow. (Doc. 13–1 at 15.) The Court does not agree. But even assuming, *arguendo*, that the record is muddled on this issue, it would be because so many medical records written by several different treating providers regarding Bessette's multiple medical problems state that Bessette failed to comply with various treatment recommendations. As noted above, Bessette failed to comply with

recommendations that he stop using tobacco and alcohol (*see, e.g.*, AR 1062, 1105, 1466, 2002, 2020, 2024, 3150, 3160); he failed to comply with recommendations that he use beta-blockers to control his hepatitis C with cirrhosis (*see, e.g.*, AR 1062, 1206, 1478); he failed to comply with recommendations that he take Pentasa, prednisone, Entocort, and other medications to control his Crohn's disease (*see, e.g.*, AR 1064, 1113, 1476, 1478, 2020, 2552); he failed to appropriately follow up with specialists, including treating physician Dr. Vecchio (*see, e.g.*, AR 975, 992, 1206, 1514, 2018); he refused to comply with recommendations that he undergo necessary diagnostic tests including colonoscopies, stool sample collections, and blood work (*see, e.g.*, AR 1063–64, 1068, 1466, 1478); and he misused pain medications and engaged in drug-seeking behavior including abruptly ending medical appointments when narcotic medications were denied (*see, e.g.*, AR 428, 959, 975, 1095, 1293, 1489, 1493, 1516, 1520, 2018).  It is difficult to know whether the prescribed treatment would have reduced or alleviated Bessette's medical problems because Bessette did not comply with his doctors' recommendations but for a few short periods.  In many of those short periods of compliance, however, the record demonstrates that Bessette did in fact improve (*see, e.g.*, AR 969–70, 1110, 3141, 3144), as the ALJ noted in her decision (*see* AR 14, 17).

Bessette argues that he did not comply with recommendations to take certain medications because he could not afford to purchase them.  (*See* Doc. 22 at 7.)  But this argument relates to only one or two medications on a few limited occasions, not to the substantial record of Bessette's failure to comply with many different treatment recommendations for no good reason.  Moreover, Bessette's doctors apparently attempted

16

to mitigate his financial problems by prescribing medications, which presumably would cost him less out-of-pocket, rather than requiring him to purchase over-the-counter medications like Imodium.  (*See, e.g.*, AR 2020 ("A prescription for Lomotil was written since [he] cannot take Imodium [because] he has no money to buy over-the-counter medications.").)  Despite Bessette's arguments to the contrary (*see* Doc. 22 at 7), there is no evidence that Bessette was unable to afford the prescription medications.  Bessette further argues that he did not comply with recommendations to take Entocort because it caused him diarrhea.  (*See* Doc. 13-1 at 15–16 (citing AR 46–48), Doc. 22 at 6–7.)  But Dr. Vecchio stated in a treatment note that, regardless of the alleged increase in diarrhea, Bessette should remain on Entocort as his best option because other treatments were impossible due to Bessette's clear history of failing to comply with treatment recommendations.  (AR 2019.)

## II.     ALJ's Analysis of the Medical Opinions

Bessette also argues that the ALJ did not give enough weight to the opinions of treating physicians Dr. Vecchio and Dr. Lishnak and gave too much weight to the opinions of non-examining agency consultants Dr. Fingar and Dr. Abramson.  Based largely on Bessette's resounding failure to comply with treatment recommendations, as discussed above, the Court disagrees and finds no error in the ALJ's analysis of the medical opinions.

### A.     Opinions of Treating Physician Dr. Vecchio

Dr. Vecchio, a gastroenterologist, began treating Bessette in approximately 2006. In May 2011, Dr. Vecchio opined as follows in a Medical Source Statement of Ability to

Do Work-Related Activities (Physical) (MSS), in relevant part: Bessette's impairments, pain from those impairments, and/or effects of prescribed medications, cause an "[e]xtreme" limitation in Bessette's ability to concentrate and focus on job-related tasks. (AR 1987.)  Moreover, although Bessette was able to concentrate and focus on job-related tasks for continuous two-hour periods consistently throughout an eight-hour workday over a five-day workweek; and although Bessette would not need more than ordinary rest breaks during a workday or shift; he would need to be near a toilet facility throughout the day and would need to take a break from work every two hours, for 30 minutes at a time, at unpredictable times, to use the toilet.  (AR 1987–88.)  Dr. Vecchio also opined that Bessette would be absent from work two to three times per week because of "unpredictable diarrhea" and "low back pain."  (AR 1989.)

The ALJ was required to analyze Dr. Vecchio's opinions under the Second Circuit's longstanding "treating physician rule," given his status as Bessette's treating physician during the relevant period.  Under that rule, a treating source's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993).  The deference given to a treating source's opinion may be reduced, however, in consideration of other factors, including the length and nature of the treating source's relationship with the claimant, the extent to which the medical evidence supports the treating source's opinion, whether the treating source is a specialist, the consistency of the treating

source's opinion with the rest of the medical record, and any other factors "which tend to

. . . contradict the opinion."  20 C.F.R. § 404.1527(c)(2)–(6); *see Halloran v. Barnhart*,

362 F.3d 28, 32 (2d Cir. 2004).  If the ALJ gives less than controlling weight to a treating

source's opinion, she must provide "good reasons" in support of that decision.  *Burgess v.*

*Astrue*, 537 F.3d 117, 129–30 (2d Cir. 2008).

The Court finds that the ALJ complied with the treating physician rule in her

analysis of Dr. Vecchio's opinions and gave good reasons in support of her decision to

afford "little weight" thereto.  (AR 20.)  The ALJ stated that she gave little weight to

Dr. Vecchio's opinions that Bessette had extreme limitations in his ability to concentrate

and that Bessette would be frequently absent from work, "because these conclusions were

inconsistent with the medical evidence of record, including [Dr. Vecchio's] own

treatment notes, [which] do not reflect disabling levels of pain."  (AR 20–21.)  Regarding

Dr. Vecchio's opinion that Bessette would need frequent access to a toilet facility during

the workday, the ALJ noted that this was reflected in the RFC determination.  (AR 21.)

The record supports the ALJ's finding that Dr. Vecchio's opinions are inconsistent

with his own treatment notes.  The ALJ accurately stated:

> Dr. Vecchio's own records note that compliance issues are a major problem
> for [Bessette], and that he frequently did not take medication as prescribed
> and ignored treatment advice regarding his Crohn's disease and hepatitis C.
> The medical evidence of record also reflected that [Bessette] frequently
> missed scheduled appointments and failed to follow-up with recommended
> testing.

(*Id.* (citing AR 1325, 1466, 1474–75, 1501).)  As discussed above, substantial evidence

supports these findings.  For example, with respect to Dr. Vecchio's own treatment notes,

a November 16, 2009 progress note written by Dr. Vecchio states that Bessette was "rarely compliant and does not show for scheduled visits or investigations," was "presently taking no medications for his Crohn's [disease] nor for [his] pain," "has not been compliant with follow up [for his cirrhosis and hepatitis C]," "has failed to show (d[id] not call and did not cancel) [three] times for a colonoscopy scheduled with propofol anesthesia," and "has not returned for follow up visits [to the] liver clinic." (AR 1478.)  In the "Impression" part of the note, Dr. Vecchio states that, although Bessette "has failed to follow any medical regimen" and is "poorly compliant," he appears for the appointment seeking pain medicines and disability status.  (AR 1478–79.)  Dr. Vecchio concludes that Bessette "was encouraged to return for appointments and obtain the needed testing" from the liver clinic and the GI office.  (AR 1479.)  This is just one example of Dr. Vecchio's many progress notes, some of which are cited above, that indicate Bessette failed to comply with treatment recommendations including taking prescribed medications and quitting smoking, frequently missed scheduled appointments and failed to follow up as requested, failed to follow through with recommended diagnostic testing including colonoscopies and blood work, and often appeared for appointments for the sole purpose of obtaining narcotics and/or obtaining disability status.  (*See, e.g.*, AR 1062–63, 1112–13, 1206, 1474–78, 2018–20.)

Moreover, substantial evidence supports the ALJ's finding that Dr. Vecchio's opinions are internally inconsistent.  First, as noted above, Dr. Vecchio opined that Bessette's impairments caused an "[e]xtreme" interference in his ability to concentrate

and focus on job-related tasks (AR 1987), while at the same time opining that Bessette would be able to concentrate and focus on job-related tasks for continuous two-hour periods consistently throughout an eight-hour workday (*id.*).  Second, Dr. Vecchio opined that Bessette would need to take a break from work every two hours to use the bathroom for 30 minutes each time (AR 1988), while at the same time opining that Bessette would not need to take more than "ordinary" rest breaks during the workday (AR 1987).  It was proper for the ALJ to give less weight to Dr. Vecchio's opinions due to these unexplained internal inconsistencies.  *See Michels v. Astrue*, 297 F. App'x 74, 75–76 (2d Cir. 2008) (because of inconsistencies in treating physician's opinions, ALJ "was free to discount [these] opinions in favor of a broader view of the medical evidence").  Moreover, contrary to Bessette's claim, a finding that Dr. Vecchio's opinions are internally inconsistent did not require the ALJ to re-contact Dr. Vecchio for clarification, given that the record includes a complete medical history, including extensive medical treatment evidence from 2006 through 2013.  *See Lowry v. Astrue*, 474 F. App'x 801, 804 (2d Cir. 2012) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999))).

Furthermore, the ALJ properly determined that Dr. Vecchio's opinions that Bessette had extreme limitations in his ability to concentrate and would be frequently absent from work, are inconsistent with the medical evidence of record.  As discussed

above, this evidence includes many treatment notes from multiple treating providers recording Bessette's failure to comply with recommended treatment and engaging in drug-seeking behavior. Also noteworthy, and confirming Dr. Vecchio's notations that Bessette appeared for appointments with him principally to obtain narcotics, the record indicates that Bessette stopped treating with Dr. Vecchio after he received Dr. Vecchio's favorable MSS and stopped almost all treatment for his IBD/Crohn's disease after another provider (Dr. Lishnak, discussed below) began prescribing methadone and other narcotic medications for Bessette's apparent back and knee pain and other issues. (*See* AR 3123–44.)

### B.     Opinions of Treating Physician Dr. Lishnak and Non-Examining Agency Consultants Drs. Fingar and Abramson

The ALJ also afforded "little weight" (AR 19) to the opinions of Dr. Timothy Lishnak, Bessette's treating primary care physician from approximately May 2011 through August 2013 (AR 2552–657, 3123–44). In July 2013, Dr. Lishnak opined in a MSS that Bessette's impairments, pain from those impairments, and/or effects of prescribed medications, cause a "[m]arked" limitation in Bessette's ability to concentrate and focus on job-related tasks. (AR 3112.) Moreover, although Bessette is able to concentrate and focus on job-related tasks for continuous two-hour periods consistently throughout an eight-hour workday over a five-day workweek; he would need more than ordinary rest breaks during a workday or shift, would need to be near a toilet facility throughout the day, and would need to take a break from work every two to three hours, for 10 minutes at a time, at unpredictable times, to use the toilet. (AR 3112–13.)

Dr. Lishnak also opined that, due to periodic "[f]lare-ups" in his Crohn's disease, Bessette would be absent from work one day every one to two months.  (AR 3116.)

Like Dr. Vecchio's opinions, the opinions of Dr. Lishnak are subject to the treating physician rule.  The ALJ properly followed the rule, giving good reasons for her decision to afford "little weight" to Dr. Lishnak's opinions.  (AR 19.)  Preliminarily, the Court notes that one of the reasons provided by the ALJ–that the opinions were "offered merely for the purposes of establish[ing] disability" (*id.*)–has no legal basis.  *See Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1996) ("The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them.  An examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner." (citing *Ratto v. Secretary*, 839 F. Supp. 1415, 1426 (D. Or. 1993) ("The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits."))).  The error is harmless, however, given that the ALJ gave several other legally proper reasons to discount Dr. Lishnak's opinions and substantial evidence supports those reasons.  Specifically, the ALJ correctly reasoned that Dr. Lishnak's opinions "appeared to be based primarily on [Bessette's] subjective allegations of his bathroom usage, which I did not find entirely credible." (AR 19.)  Bessette's credibility was clearly lacking due to his drug-seeking behavior and failure to follow treatment recommendations, discussed above; thus, substantial evidence supports this finding.  The ALJ reasonably stated:

> Most critically, I found Dr. Lishnak's opinion to be inconsistent with [Bessette's] repeatedly failing to follow the treatment recommendations of his various healthcare providers.  If [his] symptoms were as significant as

outlined by Dr. Lishnak then he would likely follow the treatment recommendations of his healthcare providers in order to diminish the effects his symptoms have on his work functionality.

(*Id.*)

The ALJ also correctly found that Dr. Lishnak's opinions are inconsistent with the opinions of non-examining agency consultants Dr. Ann Fingar and Dr. Leslie Abramson. In June 2010, after reviewing the record, Dr. Fingar opined that Bessette's "[a]llegations are not entirely credible," and that the "[medical evidence of record] indicates non-compliance with med[ication]s, narcotic[-]seeking[,] as well as [Bessette] admitting taking other's med[ication]s for his benefit." (AR 1230.) Dr. Fingar concluded that "[the] [t]otality of [the medical evidence of record] indicates a much higher level of functioning than reported by [Bessette]." (*Id.*) Similarly, in July 2009, after reviewing the record, Dr. Abramson opined that Besssette was "[n]oted . . . to have inconsistent pain behavior when observed indirectly as opposed to . . . when [he] knew he was being seen by providers," and to have "poor[] control[]" of his ailments "intermittently." (AR 1160.) Dr. Abramson stated that Bessette had "[p]oor compliance in follow[-]up[,] [which was] seen frequently as limiting [his] treatment success." (*Id.*)

The ALJ did not err in giving "the most weight" to the opinions of Drs. Fingar and Abramson. (AR 19.) State agency medical consultants are "highly qualified" in their area of specialty and also "experts in Social Security disability evaluation," and thus their opinions must be considered. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). While treating source opinions presumptively are entitled to controlling weight, and examining source opinions ordinarily are given greater weight than non-examining consultant

opinions, opinions of these non-examining consultants may be afforded greater weight than treating source opinions where there is good reason to reject the treating source opinions and substantial evidence supports the consultant opinions.  *See Schisler*, 3 F.3d at 568 ("[The regulations] permit the opinions of non-examining sources to override treating sources' opinions, provided they are supported by evidence in the record.").  Here, the opinions of treating physicians Dr. Vecchio and Dr. Lishnak are inadequate for the reasons stated above and in the ALJ's decision, principally due to Bessette's lack of compliance with treatment recommendations and drug-seeking behavior.  Moreover, the opinions of the agency consultants are consistent with and supported by the record as a whole.  Although Drs. Fingar and Abramson were not able to consider the entire record, as records and medical opinions–including the May 2011 opinions of Dr. Vecchio and July 2013 opinions of Dr. Lishnak–were added after they made their opinions, they did consider over 700 pages of medical evidence including Dr. Vecchio's treatment notes through December 2009 (*see* AR 405–1224), and Bessette does not argue that his condition worsened after that date.

Finally, although not noted by the ALJ, the Commissioner accurately points out another deficiency in Dr. Lishnak's opinions: they are not supported by his own treatment notes.  (*See* Doc. 18 at 23.)  Specifically, although Dr. Lishnak opines with great specificity about how often and for how long Bessette would be required to use the toilet during the workday, only a small percentage of his treatment notes document Bessette's need to use the toilet due to his IBD/Crohn's-related symptoms.  (*See* AR 2552–657, 3123–44.)  Furthermore, Dr. Lishnak appears to have actually *treated* Bessette's

25

IBD/Crohn's symptoms on only two occasions, once in November 2011 by prescribing Imodium (AR 2649) and once in May 2013 by prescribing Entocort (AR 2555), which thereafter was found to have improved Bessette's symptoms (AR 3141).

## III.    Bessette's Need to Take Bathroom Breaks

Lastly, Bessette argues that the ALJ erred in assessing his RFC because she did not adequately consider the frequency and duration of Bessette's need to take bathroom breaks throughout the day.  Bessette claims that, in its February 2013 Order (AR 126–27), the Appeals Council specifically ordered the ALJ to determine this issue, and the ALJ failed to do so in her decision.  Bessette's argument is unavailing.

The Appeals Council Order directed the ALJ to further evaluate Bessette's RFC because the RFC findings contained in the ALJ's initial decision were "not adequately expressed in work-related terms because the term 'repetitive' is not defined and [Bessette's] need to use bathroom facilities is not expressed in terms of frequency or duration."  (AR 126 (citation omitted); *see* AR 112.)  The ALJ's current decision includes as part of Bessette's RFC determination a requirement that Bessette have "access to bathroom facilities during the workday at least every [two] hours."  (AR 16.)  The ALJ was not required to explicitly include a duration requirement regarding Bessette's bathroom usage, as the VE testified at the administrative hearing that a hypothetical individual with Bessette's RFC would be able to work, notwithstanding bathroom breaks at least every two hours, as long as he was not "off task [for] more than 10 percent of the [workday]."  (AR 93; *see* AR 86.)  Given that the ALJ relied on the VE's testimony at step five in determining that there are jobs existing in significant numbers in the national

26

economy that Bessette can do, it can reasonably be inferred that the ALJ found that, although Bessette required access to a bathroom at least every two hours, his bathroom use would not total more than 10 percent of the workday.  Bessette has not presented credible evidence to the contrary: his own subjective statements lack credibility for the reasons discussed above and stated in the ALJ's decision; and, as the Commissioner points out, although observation monitoring sheets from the Vermont Department of Corrections record the times that Bessette went to the "toilet" while in prison in 2008 (*see, e.g.*, AR 2785, 2787, 2805, 2859, 2861, 2868–69, 2874–75, 2932), these sheets "do not state whether Mr. Bessette was going to the bathroom to urinate or have a bowel movement, how long it [took] to get to the bathroom, whether [Bessette] had to wait in a line to use the bathroom, or any other particulars besides [a specific time observed in the toilet]." (Doc. 18 at 25.)  As the Commissioner also points out, Bessette underwent multiple surgeries in 2008 while he was in prison, including placement of a diverting loop ileostomy in March, and thus for at least part of his incarceration, he was apparently using a colostomy bag, which would affect his toilet use. (*Id.* (citing AR 428, 1081–86, 1098–100).)

Bessette's argument regarding his need to use the bathroom frequently and unpredictably throughout the day, relies on the opinions of Drs. Vecchio and Lishnak, who, as discussed above, opined that Bessette would need to use the bathroom for 10–30-minute periods, respectively, at unpredictable times throughout the workday. (AR 1988, 3113.)  But for the reasons explained above, the ALJ properly afforded only limited weight to those opinions and thus did not include in his RFC determination the limitation

that Bessette needed to use the toilet for periods as lengthy as 10–30 minutes at unpredictable times throughout the day.  Thus, the ALJ complied with the order of the Appeals Council to address Bessette's bathroom usage in the decision, and more importantly, the ALJ's findings on this issue are supported by substantial evidence.

## Conclusion

For these reasons, the Court DENIES Bessette's motion (Doc. 13), GRANTS the Commissioner's motion (Doc. 18), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 9th day of December, 2015.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge